UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONNIE CUMMINGS, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>CENERGY INTERNATIONAL SERVICES, LLC,<br><br>Defendant. | 1:17-cv-00484-LJO-JLT<br><br>**MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS**<br><br>(Doc. 17) |

## I. INTRODUCTION

Currently pending before the Court are Plaintiffs' Donnie Cummings and Charles Beaty's ("Plaintiffs") motion for a preliminary injunction against Defendant Cenergy International Services, LLC ("Cenergy") and Cenergy's Federal Rule of Civil Procedure 12(b)(1) motion to dismiss Plaintiffs' complaint for lack of subject matter jurisdiction on standing and ripeness grounds. Plaintiffs' motion for a preliminary injunction has been held in abeyance until Cenergy's motion to dismiss on jurisdictional grounds is resolved. For the reasons set forth below, Cenergy's motion to dismiss is DENIED.

## II. **FACTUAL BACKGROUND**

Plaintiffs performed work for the Chevron corporation as well site/drill site managers, and allege they were intentionally misclassified as independent contractors by Chevron and impermissibly denied overtime wages pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b). Plaintiffs are pursuing claims in collective actions under the FLSA against Chevron in separate proceedings: *McQueen, et al. v. Chevron*, No. 4:16-cv-02089-JSW (N.D. Cal.), filed on April 20, 2016 (referred to herein as the "underlying FLSA litigation"), and *Cummings v. Chevron*, JAMS Arbitration Reference No. 1100086694.

According to Plaintiffs, although Chevron controlled Plaintiffs' work and directly supervised Plaintiffs, Chevron attempted to insulate itself from FLSA liability by creating an artificially complex structure to employ Plaintiffs. (Doc. 16, ¶ 3.) Specifically, Chevron contracted with Cenergy to be an intermediary between Chevron and Plaintiffs. When Plaintiff Cummings began working for Chevron through Cenergy, he was required to sign a Master Services Agreement ("MSA") as an individual that set out the rate of pay and described some of the rights and obligations of Cummings as a site manager. (Doc. 16, ¶ 34.) However, in late 2013, Cummings was notified that policies for consultant site managers were changing and all independent contractor site managers could no longer receive pay as individuals, and would instead be required to receive their pay through an LLC or other corporate form. Plaintiff Cummings created Cummings Consulting LLC ("CCLLC"), for the sole purpose of continuing to work for Chevron through Cenergy, and then executed a new MSA on behalf of CCLLC, the entity through which he was paid for his services to Chevron as a site manager. (*Id*.)

Plaintiff Charles Beaty was contacted through Cenergy by a Chevron superintendent and told of an individual work opening. He was informed that before he could perform any work for Chevron, however, he was required to attend Chevron's training. Completion of that training was required for any site manager to perform work for Chevron. Plaintiff Beaty was also informed that as a condition of working for Chevron through Cenergy, he was required to form a corporate entity through which to

receive wages. Plaintiff Beaty formed Drilling Consultants, Inc. through which he received payments for his work for Chevron, and executed an MSA with Cenergy. (Doc. 16, ¶¶ 26-33.)

The MSAs with Cenergy required the corporate entities to (1) be classified as independent contractors and not employees; (2) be solely responsible for payment of all wages to Plaintiffs; and (3) indemnify Cenergy and Chevron against any loss arising out of the agreement. These MSAs were presented to Plaintiffs as-is with no negotiation, and signing the MSAs was a condition of working for Chevron through Cenergy. An indemnity provision contained in the MSAs required the following:

> Contractor [corporate entity] shall be liable for any claim arising out of any illness, injury or death to Contractor employees, agents or vendors, or for any claim arising out of any loss or damage to the property of Contractor, its employees agents or vendors arising out of or relating to the Agreement or performance of the Services under this Agreement and **REGARDLESS OF WHETHER CAUSED OR BROUGHT ABOUT BY CIS [Cenergy] OR CIS CUSTOMER'S [Chevron] NEGLIGENCE OR FAULT (INCLUDING ACTIVE, PASSIVE, SOLE, JOINT OR CONTRIBUTORY NEGLIGENCE) OR ANY OTHER THEORY OF LEGAL LIABILITY, INCLUDING BREACH OF WARRANTY, BREACH OF AGREEMENT, STATUTE OR STRICT LIABILITY** and Contractor shall defend, protect, indemnify and hold harmless CIS, its parent, subsidiary and affiliated companies and all of their officers, directors, employees and representatives and Customers from and against any loss, cost, claim, obligation to indemnify another, suit, judgment, award or damage (including reasonable attorney's fees and costs) on account of such illness, injury, death, loss or damage.

(Doc. 16-2, p. 10; Doc. 16-3, p. 10.) The MSAs also contained an arbitration provision that requires all disputes be resolved through arbitration in Texas under the American Arbitration Association's "Construction Industry Rules":

> **Arbitration**. All claims, disputes or controversies arising out of, in connection with or in relation to this Agreement or the Services, including any and all issues of arbitration of such claim, dispute or controversy (hereinafter "Dispute"), and regardless of whether the Dispute is based or claimed to be based in whole or in part on a claim by either Party of breach of this Agreement shall be subject to the following dispute resolution procedure:
>
> (a) <u>Notice</u>. In the event that a Dispute arises between Contractor and [Cenergy], and/or between Contractor and a [Cenergy] Customer, Contractor shall immediately notify [Cenergy] of such Dispute in writing in order to provide [Cenergy] with an opportunity to informally resolve the Dispute.
>
> (b) <u>Mediation.</u> In the event that the informal dispute resolution efforts set out in 21 (a)

above fail to settle the Dispute between Contractor and [Cenergy] within 30-days of such written notice the parties shall submit the Dispute to formal mediation which shall be conducted by the American Arbitration Association ("AAA") in Houston, Texas in accordance with the AAA Energy Industry Rules for Mediation then in effect.

(c) <u>Arbitration</u>. In the event that the mediation fails to settle the Dispute, then, subject to Article 20(d) below, the Dispute shall be submitted to mandatory and binding arbitration conducted by the AAA in accordance with its Construction Industry Rules then in effect. Such arbitration shall be conducted before a single arbitrator in Houston, Texas. The arbitration shall be conducted in accordance with the International Institute for Conflict Prevention and Resolutions Rules at present in force, exclusive of its principles of conflicts of laws for the determination of the rights and remedies under the Agreement and for all aspects of the award hereunder, except to the extent that United States General Maritime law, exclusive of its principles of conflicts of laws governs the Dispute at issue. The arbitrator shall have the power to award reasonable attorney's fees, costs and expenses to the prevailing party in any such arbitration proceeding.

(Doc. 16-2, p. 11-12; Doc. 16-3, p. 11-12.)

On March 21, 2017, Cenergy sent a demand letter to CCLLC indicating it had become aware that "an employee of Cummings Consulting, LLC" (*i.e*., Plaintiff Donnie Cummings) had opted to be a member of the purported FLSA class action against Chevron pending before the U.S. District Court for the Northern District of California in case number 4:16-cv-02089-JSW. (Doc. 16-4, Exh. D, p. 2.) Cenergy advised CCLLC that, "pursuant to a separate agreement," Cenergy "may be obligated to defend and indemnify Chevron Corporation for any costs, expenses, or other damages sustained as a result of that lawsuit" and that Chevron had already demanded that Cenergy pay for legal fees and costs incurred in the defense of that FLSA lawsuit. (*Id.* at 4.) Citing the MSA agreement between CCLLC and Cenergy executed in January 2014, Cenergy demanded that CCLLC "reimburse [Cenergy] for any and all costs that it incurs or owes as a result of the Lawsuit," including any attorneys' fees, amounts reimbursed to Chevron, costs, penalties, damages, or any other losses. (*Id.*) Cenergy indicated it had already incurred $15,488.50 in costs and fees related to the FLSA lawsuit against Chevron, and demanded that CCLLC remit that amount within 15 days of the date of the demand letter. (*Id.*) If CCLLC failed to remit that amount within the 15-day window, Cenergy stated it would "take immediate action to enforce its rights under the MSA" and would initiate legal proceedings against

4

CCLLC in Houston, Texas. (*Id.*)

On April 5, 2017, Plaintiffs filed suit in this Court, on behalf of themselves and all others similarly situated, seeking a declaration under 28 U.S.C. § 2201, the Declaratory Judgment Act ("DJA"), that Cenergy has no legal right to attempt to collect or obtain, through court or arbitration, the wages that Plaintiffs seek from Chevron or associated penalties, damages, and interest, or Chevron's or Cenergy's defenses costs, including attorneys' fees. Plaintiffs contend Chevron and Cenergy have improperly attempted to "contract around the FLSA" by insisting Plaintiffs pay, through their corporate entities, the wages Chevron is legally obligated to pay Plaintiffs under the FLSA and the costs of Chevron's defense in the separate FLSA collective action.

On May 1, 2017, Plaintiffs filed a motion for preliminary injunction asserting that Cenergy has commenced arbitration against Plaintiffs' corporate entities pursuant to the MSAs. Plaintiffs seek to enjoin those arbitration proceedings and to halt Cenergy from attempting to collect indemnification. On May 2, 2017, Cenergy filed a motion to dismiss for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Cenergy's motion to dismiss was granted, and Plaintiffs filed an amended complaint June 29, 2017. (Doc. 16.) Currently pending is Cenergy's motion to dismiss Plaintiffs' First Amended Complaint ("FAC") on the grounds that Plaintiffs lack standing in their individual capacities to challenge the MSAs, and that their request for declaratory relief is not ripe.

### III. LEGAL STANDARD

A defendant may move for dismissal of an action for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). A motion to dismiss for lack of subject matter jurisdiction will be granted if the complaint, on its face, fails to allege facts sufficient to establish subject matter jurisdiction. *See Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003). If a plaintiff lacks standing under Article III of the U.S. Constitution, then the court lacks subject matter jurisdiction and the case must be dismissed. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83,

101-02 (1998). The related doctrine of ripeness is a means by which federal courts dispose of matters that are premature for review because the purported injuries are too speculative and may never occur. As standing and ripeness pertain to the federal courts' subject matter jurisdiction, they are properly raised in a Rule 12(b)(1) motion to dismiss. Once a party has moved to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the opposing party bears the burden of establishing the Court's jurisdiction. *See Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994); *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010); *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989).

## IV. ANALYSIS

**A.  Plaintiffs Have Standing to Challenge Enforceability of MSAs**

Plaintiffs maintain they have standing in their individual capacities to challenge the MSAs with Cenergy because they are third-party beneficiaries of the MSAs and because Cenergy has threatened suit against them in their individual capacities, causing "injury in fact."

**1.  Plaintiffs Sufficiently Allege they are Third-Party Beneficiaries of the MSAs**

A third party may qualify as a beneficiary under a contract where the contracting parties have intended to benefit that third party and such intent appears on the terms of the contract. *Ascherman v. Gen. Reinsurance Corp.*, 183 Cal. App. 3d 307, 311 (1986). It is well settled, however, that enforcement of a contract by persons who are only incidentally or remotely benefitted by it is not permitted. *Lucas v. Hamm*, 56 Cal. 2d 583, 590-91 (1961) ("A third party should not be permitted to enforce covenants made not for his benefit, but rather for others. He is not a contracting party; his right to performance is predicated on the contracting parties' intent to benefit him . . . ."). While intent is pivotal, there is no requirement that "both of the contracting parties must intend to benefit the third party . . . ." *Schauer v. Mandarin Gems of Cal. Inc.,* 125 Cal. App. 4th 949, 958 (2005). Whether a third party is an intended beneficiary or merely an incidental beneficiary to the contract is predicated on the parties' intent, which is gleaned from reading the contract as a whole in light of the circumstances

under which it was entered. *Walters v. Marler*, 83 Cal. App. 3d 1, 33 (1978).[1]

Ultimately, the third-party determination turns on the manifestation of intent by the contracting parties to confer a benefit on a third party. *Hess v. Ford Motor Co.*, 27 Cal. 4th 516, 524 (2002). "Ascertaining this intent is a question of ordinary contract interpretation." *Id*. The central goal of contract interpretation is to give effect to the parties' intent as it existed at the time of contracting. Cal. Civ. Code § 1636; *Waller v. Truck Ins. Exchange, Inc.*, 11 Cal. 4th 1, 18 (1995). Intent should be, if possible, inferred solely from the written provisions of the contract. Cal. Civ. Code § 1636; *Waller*, 11 Cal. 4th 1, 18 (1995). Nevertheless, an inflexible "rule that would limit the determination of the meaning of a written instrument to its four corners merely because it seems to the court to be clear and unambiguous, would either deny the relevance of the intention of the parties or presuppose a degree of verbal precision and stability our language has not attained." *Pac. Gas & Elec. v. G.W. Thomas Drayage etc. Co.*, 69 Cal. 2d 33, 37 (1968). "A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates." Civ. Code § 1647. "In determining the meaning of a written contract allegedly made, in part, for the benefit of a third party, evidence of the circumstances and negotiations of the parties in making the contract is both relevant and admissible." *Garcia v. Truck Ins. Exchange*, 36 Cal. 3d 426, 437 (1984).

The FAC's bolstered allegations pertaining to Plaintiffs' third-party beneficiary status are sufficient, at the pleading stage, to establish Plaintiffs' standing in their individual capacities. While the MSAs do not identify Plaintiffs by name, Plaintiffs allege Cenergy understood, based on the circumstances under which the MSAs were signed, that Plaintiffs were the only workers of their respective corporate entities who would provide any services to Cenergy's customers. Plaintiff Beaty was contacted by a Chevron superintendent notifying Beaty of an individual work opening for which he

---

[1] To sue as a third-party beneficiary of a contract under federal law, the analysis is the same: the third party must show that the contract reflects the express or implied intention of the parties to the contract to benefit the third party. *See Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1211 (9th Cir. 1999).

might be qualified. Before he could work for Chevron, however, Beaty was required to complete training as a consultant site manager. (Doc. 16, ¶ 31.) Moreover, the complaint alleges it was always understood that only Beaty would perform work for Chevron:

> At no point leading up to the execution of his agreement did Mr. Beaty discuss a role with Chevron or Cenergy other than him performing all the work and receiving all the compensation. At no point did Cenergy, Chevron, or Mr. Beaty suggest that anyone other than Mr. Beaty would perform work under the name Drilling Consultants. At no point did Cenergy, Chevron, or Mr. Beaty suggest that anyone other than Mr. Beaty would receive compensation paid to Drilling Consultants, or that Drilling Consultants had any officers, staff, or employees other than Mr. Beaty.

(Doc. 16, ¶ 33.)

As to Plaintiff Cummings, he was already working for Chevron prior to forming the corporate entity and he had previously signed an MSA as an individual. (Doc. 16, ¶ 34.) In 2013, Cummings was notified that the policies for consultant site managers were changing and that site managers could no longer receive pay as individuals, but instead would be required to receive their pay through a corporate form. Cummings was informed that unless he provided a corporate entity to receive payments, invoices submitted to Cenergy after December 20, 2013, would not be paid. There was never any discussion or suggestion that anyone other than Cummings would provide services to Chevron or that Cummings' corporate entity had any staff or other employees. Cenergy knew Cummings was the only individual to benefit under the MSA with his corporate entity because site managers who worked for Chevron had to undergo specific training, and hiring of any additional workers would have required the involvement of both Cenergy and Chevron. (Doc. 16, ¶¶ 35-36.) Plaintiffs allege Cenergy understood that individual site managers would be the only direct beneficiaries of the MSAs.

Reading the MSAs in the light of these alleged circumstances, the situation is analogous to *Schauer v. Mandarin Gems of Cal., Inc.*, 125 Cal. App. 4th 949, 957-58 (2005), where the court concluded a woman was a third-party beneficiary to a sales contract between her betrothed and the jewelry store for an engagement ring. The court explained that the couple went shopping for the ring

together, the plaintiff selected the ring she wanted, she caused it to be purchased for her, and the ring was purchased for the sole and stated purpose of giving the ring to the plaintiff. *Id*. at 958. Under these circumstances, the court concluded the jeweler must have understood the intent was to enter into the sales contract for plaintiff's benefit and she was therefore a third-party beneficiary of the sales contract. *Id*. Here, Plaintiffs formed corporate entities at the specific request of Cenergy, and it was Cenergy who implemented this policy and ensured that all necessary changes were made by Plaintiffs. Cenergy also communicated directly with its site managers about how to create these corporate entities. Chevron and Cenergy specifically solicited Plaintiff Beaty to perform work for Chevron and then conditioned payment for Plaintiff Beaty's services on Plaintiff Beaty's formation of a corporate entity. Cenergy *must* have understood the MSA was entered into for Plaintiff Beaty's benefit. Similarly, by mandatorily conditioning Plaintiff Cummings' payment for work performed for Chevron on formation of a corporate entity, Cenergy must have understood the MSA with Cummings' corporate entity was entered into for Plaintiff Cummings' benefit alone. At the pleading stage, this is sufficient to confer standing on Plaintiffs as a third-party beneficiary under the MSAs.

### 2. Threat of Lawsuit Sufficient to Confer Standing

Cenergy maintains Plaintiffs have failed to allege adequately standing in their personal capacities to challenge the MSAs between Cenergy and the corporate entities. (Doc. 17, 10:20-12:4.) Plaintiffs contend they were threatened with suit in their personal capacities, giving rise to standing. Cenergy argues there has not been any actual threat of litigation against Plaintiffs in their individual capacities – only the corporate entities Plaintiffs formed. While Cenergy reserves the right to pursue claims against Plaintiffs in their individual capacities should it be necessary, Cenergy asserts nothing demonstrates that any threat of litigation has occurred against Plaintiffs individually.

The threat of litigation is a cognizable injury sufficient to confer standing in a contract dispute, even where the threatened individual/entity is not a party to the challenged contract. *Newcal Industries, Inc. v. IKON Office Solution*, 513 F.3d 1038, (9th Cir. 2008) (citing *Societe de Conditionnement en*

*Aluminium v. Hunter Engineering Co., Inc.*, 655 F.2d 938 (9th Cir. 1981)). While Cenergy asserts it has not yet *expressly* threatened suit against Plaintiffs in their individual capacity, the allegations of the complaint and the exhibits attached to it sufficiently establish a realistic threat of suit against Plaintiffs individually. First, Plaintiffs allege that the corporate entities were formed by Plaintiffs as a specific requirement of Cenergy to either obtain work with Chevron or to continue work with Chevron. Payment for any services was conditioned upon Plaintiffs creating a corporate entity to receive payment for work provided. These allegations create a reasonable inference that the corporate entities were created for no purpose of Plaintiffs and solely for the benefit of Cenergy, maintained only as a corporate fiction, and potentially renders Plaintiffs vulnerable to suit in their individual capacities.

Second, Cenergy has expressly stated it *will* initiate suit against Plaintiffs in their individual capacities if there are any indications the corporations have dissolved or otherwise did not maintain proper corporate formalities. Attached to Plaintiffs' complaint are two letters from Cenergy's counsel that indicate Cenergy's reservation of right to maintain claims against Plaintiffs individually, should facts indicate suit is necessary. (Docs. 16-5, 16-6.) In a footnote, Plaintiffs indicate they offered to dismiss this action in exchange for Cenergy's agreement not to pursue indemnification against them personally, but this was refused by Cenergy. (Doc. 19, 5:2 n. 1.) Cenergy contends this footnote improperly discloses confidential settlement negotiations and is not admissible under Federal Rule of Evidence 408. Rule 408 prohibits the introduction of settlement evidence when offered to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement. Fed. R. Evid. 408. The Court may admit evidence of settlement negotiations for other purposes, however. *Id.* In this case, Plaintiffs offer statements made in a settlement negotiation not to prove liability or damages, but to demonstrate Plaintiffs have standing. This is not an inadmissible use of settlement negotiations under Rule 408.[2] Cenergy is unwilling to relinquish any right it may have to

---

[2] This information is not being admitted for use at trial but to determine jurisdiction.

pursue its indemnity claim, and has expressly maintained it will bring suit when it deems necessary. These facts together constitute a threat of suit against Plaintiffs in their individual capacity giving rise to standing. *Newcal*, 513 F.3d at 1056.

**B.     Plaintiffs Have Established Their Declaratory Relief Claim is Constitutionally Ripe**

The Declaratory Judgement Act ("DJA") states, "In a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declarations." 28 U.S.C. § 2201(a).  Therefore, a district court must first inquire whether there is an actual case or controversy within its jurisdiction. *Am. States Ins. Co. v. Kearns*, 15 F.3d 142, 143 (9th Cir. 1994). The constitutional ripeness of a declaratory judgment action depends upon "whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941); *see also Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 671 (9th Cir. 2005).

Plaintiffs' sole claim is for a declaration under the DJA that finds the indemnification clauses in the MSAs unenforceable as contrary to public policy under the FLSA. Cenergy contends Plaintiffs have failed to allege a controversy that is of "sufficient immediacy and reality," and their claim for declaratory relief is therefore not ripe.  According to Cenergy, Plaintiffs' theory that the MSAs' indemnity clauses are unenforceable as contrary to public policy is necessarily contingent on the legal applicability of the FLSA in the underlying suit with Chevron – a finding that Court may or may not (due to settlement) reach at an unknown time in the future.  Specifically, if Plaintiffs are deemed independent contractors in that lawsuit, the FLSA will not apply and cannot govern the enforceability of any contractual indemnity clause in the MSAs between Plaintiffs and Cenergy. *See, e.g., Taylor v. Waddell & Reed Inc.*, No. 09-cv-02909-AJB-WVG, 2013 WL 435907, at *7 (S.D. Cal. Feb. 1, 2013) (FLSA does not apply to independent contractors, only employees).  As the employee-employer relationship between Plaintiffs and Chevron (a non-party in this litigation) will only be determined, if at

all, in a separate FLSA suit, Cenergy contends the controversy between Plaintiffs and Cenergy over the enforceability of the MSAs' indemnity clauses in view of FLSA public policy is not "sufficiently immediate" to be considered ripe.

Plaintiffs argue their declaratory relief claim is not dependent on Plaintiffs' employment relationship with Chevron.  If Plaintiffs win the underlying FLSA suit, Plaintiffs argue any attempt by Chevron to shift FLSA liability is contrary to law and public policy, regardless of whether the liability is shifted to an employee or some other individual or entity.  Plaintiffs further argue that, to the extent Chevron prevailed in proving Plaintiffs are *not* employees under the FLSA, public policy is nonetheless violated if Chevron, through Cenergy and the MSAs with Plaintiffs' corporations, is able to shift its attorney's fees stemming from the FLSA litigation to Plaintiffs.  Plaintiffs maintain one of the remedial purposes of the FLSA is to encourage private enforcement by protecting workers who file claims.  Plaintiffs' argument continues as follows.  Congress promoted this policy by awarding attorney's fees only to prevailing FLSA plaintiffs, not prevailing defendants.  29 U.S.C. § 216(b).  Congress also provided workers a cause of action for retaliation, even where no FLSA liability was ultimately established. 29 U.S.C.  § 215(a).  By not providing attorney's fees for prevailing defendants and by permitting retaliation suits even where there is no FLSA violation, Congress codified a policy of protecting workers' ability to enforce the statute by filing claims and engaging in protected activity (i.e., submitting complaints to their employers), not simply protecting those workers who prove their rights were violated under the FLSA.  Given this strong policy of protecting workers, even if they do not prevail under the FLSA, a contractual indemnity clause that shifts attorney's fees to workers of unsuccessful FLSA claims vitiates these policy objectives and acts as a deterrent.  For these reasons, Plaintiffs contend a declaration that the indemnity provision violates public policy is constitutionally ripe – it is not contingent on the outcome of the underlying FLSA suit.

The pivotal concern of the ripeness inquiry is "whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." *Richardson v. City &*

*County of Honolulu*, 124 F.3d 1150, 1160 (9th Cir. 1997) (quotations omitted). Where a dispute hangs on "future contingencies that may or may not occur," *Clinton v. Acequia, Inc.*, 94 F.3d 568, 572 (9th Cir. 1996), it may be too "impermissibly speculative" to present a justiciable controversy. *Portland Police Ass'n v. City of Portland*, 658 F.2d 1272, 1273 (9th Cir. 1981). Cenergy maintains Plaintiffs' theory that the indemnity clause is void as contrary to public policy under the FLSA is not ripe.

Under California law, "a contractual provision that contravenes public policy, as expressed in statute or implied from its language, is 'either void or unenforceable.'" *Santillan v. USA Waste of Cal., Inc.*, 853 F.3d 1035, 1045-46 (9th Cir. 2017) (quoting *Akopyan v. Wells Fargo Home Mortg., Inc.*, 215 Cal. App. 4th 120, 135-36 (2013) (disregarding an express contract term that was contrary to public policy)). "Federal 'public policy' is typically found in the Constitution, treaties, federal statutes and regulations, and court cases." *Thomas James Assocs., Inc. v. Jameson*, 102 F.3d 60, 66 (2d Cir. 1996) (arbitration clause in employment agreement unenforceable as against public policy).

The Ninth Circuit has not yet considered whether contractual indemnity provisions shifting a defendant's damages and/or attorney's fees stemming from FLSA litigation are unenforceable as violating public policy. Several district court decisions from other circuits, however, have considered contractual indemnity in misclassification FLSA cases, but they are split on this question. As Cenergy notes, in *Spellman v. Am. Eagle Express, Inc.*, 680 F. Supp. 2d 188, 189 (D.D.C. 2010), the court denied a motion to dismiss the employer's counterclaim for contractual indemnity. The court reasoned the counterclaim alleged the worker-plaintiffs were independent contractors and not employees under the FLSA. Accepting these allegations as true for purposes of pleading, the FLSA did not apply and would not operate to preempt or invalidate the indemnity provision. As such, the court determined it could not assess the viability of the indemnity claim until the employment relationship was determined on the merits. The same reasoning was adopted by the court in *Dobbins v. Scriptfleet, Inc.*, No. 8:11-cv-1923-AEP, 2012 WL 2282560 (M.D. Fla. June 18, 2012), in denying a motion to dismiss a defendant's counterclaim for contractual indemnity based on allegations the plaintiffs were independent

contractors and the FLSA did not apply to invalidate the indemnity provisions. This is Cenergy's central contention: if Plaintiffs' are independent contractors, the FLSA does not apply and its public policy does not govern the enforceability of the MSAs. The employment relationship between Plaintiffs and Chevron is being litigated in the underlying FLSA action, and it is uncertain whether or when that determination will be made.

On the other hand, as Plaintiffs indicate, at least two district courts have concluded the public policies underpinning the FLSA are implicated when FLSA claims are *filed* – not only when the plaintiff prevails. For example, in *Fernandez v. Kinray, Inc.*, No. 1:13-cv-04938-LDH-SMG, 2014 U.S. Dist. LEXIS 17954 (E.D.N.Y. Feb. 5, 2014), the court dismissed a defendant's indemnity counterclaim in an FLSA misclassification case reasoning the indemnity provision was unenforceable as violating the public policy of the FLSA even if the plaintiffs were determined to be independent contractors. The court noted that in enacting the FLSA, Congress intended to protect plaintiffs' ability to bring claims and encourage private enforcement of the statute – "a policy that applies before the parties know whether or not the claim will be successful." *Id.* As indicia of this public policy, the court observed that the FLSA provides for prevailing <u>plaintiffs</u> to recover attorney's fees, but does not permit fee shifting for prevailing <u>defendants</u>. *Id.* This was designed to curb a deterrent to private enforcement by eliminating the financial risk of filing a claim. *Id.* Allowing a prevailing defendant to shift attorney's fees pursuant to a contractual indemnity provision would have a chilling effect on private enforcement. *Id.* The court concluded the defendant's indemnity claim was therefore contrary to the FLSA's public policy, whether or not the plaintiffs ultimately were determined to be employees under the statute.

In another FLSA misclassification collective action, the court refused to issue a notice to prospective opt-in class members indicating they may be liable for attorney's fees pursuant to an indemnity agreement within their independent contractor agreement with defendants. *Abdul-Rasheed v. Kablelink Commc'n, LLC*, No. 8:13-cv-00879-MAP, 2013 WL 6182321, at *5 (M.D. Fla. Nov. 25,

2013). The court reasoned even if the plaintiffs were deemed independent contractors, the defendants would still only be entitled to attorney's fees under the court's inherent powers if the litigation was conducted in bad faith, vexatiously, wantonly, or for oppressive reasons. *Id.* The court concluded that to interpret the law to permit the award of attorney's fees to defendants pursuant to the contractual indemnity provision in the independent contractor agreement "would impose a chilling effect that would defeat the remedial purpose of the FLSA." *Id.* Compellingly, the district court in *Abdul-Rasheed* reasoned:

> Whether a person is an employee or an independent contractor is a threshold issue in many FLSA cases. If courts imposed an attorneys' fees award against unsuccessful independent contractors that have indemnity agreements, it would incentivize employers to mis-classify employees as independent contractors in an independent contractor agreement that contains an indemnity provision based on the hope that the possibility of an attorneys' fee award would dissuade litigation on the issue.

*Id.* at *6.

Plaintiffs have established their theory of the unenforceability of the indemnity provision is not necessarily contingent on the employee-employer relationship determination in the underlying FLSA suit and is, therefore, jurisdictionally ripe. Plaintiffs have articulated a plausible theory, supported by caselaw, that the MSAs' indemnity clauses violate public policy whether or not Plaintiffs are found to be employees of Chevron because the FLSA's public policy is implicated when a worker *files* an FLSA claim, not just when a worker prevails in the litigation and, in misclassification cases, *proves* the applicability of the statute to their claims. Despite the split of authority articulated by the parties and outlined above, at least two district courts have concluded FLSA public policy forecloses indemnity provisions that shift attorney's fees for FLSA suits onto the workers who file those suits, regardless of the outcome of the case on the merits. *Fernandez*, 2014 U.S. Dist. LEXIS 17954; *Abdul-Rasheed*, 2013 WL 6182321, at *5. The Court finds these two decisions well reasoned and persuasive and follows them here.

Notably, the MSAs' indemnity clauses attempt to bind Plaintiffs' corporate entities, not Plaintiffs who filed the FLSA claim. As the indemnity sought through Cenergy would not shift to Plaintiffs themselves, the public policy protecting private enforcement of the FLSA by workers is not necessarily impinged. The Court finds, however, that Plaintiffs are not precluded, as a matter of law, from suffering pecuniary loss in their individual capacities as a result of the indemnity. Although Plaintiffs may not be liable on an individual basis for the obligations of their respective corporate entities, a loss to the corporate entities due to indemnity for liability and/or fees arising out of FLSA litigation *may* result in a loss to Plaintiffs' capital investment in their respective entities. In that way, attorney's fees from the FLSA litigation would be, at least in part, shifted onto the workers who filed suit and create the type of deterrence to private enforcement the statute was designed to avoid. *Local 1035 Int'l Bhd. of Teamsters v. Pepsi Allied Bottlers, Inc.*, 99 F. Supp. 2d 219, 221-22 (D. Conn. 2000) (FLSA suit where indemnification clause in collective bargaining agreement deemed unenforceable against union because "the union would probably be utilizing funds collected as dues from the plaintiffs themselves in order to satisfy the judgment," which is against the public policy of the FLSA). Additionally, as alleged in the FAC and discussed in the prior section on standing (*section* III.A.2), there is a possibility indemnity sought against the corporate entities would pass through to Plaintiffs as individuals if the entities failed, for example, to observe proper corporate formalities or were not maintained or formed properly under the law. For the purposes of *pleading*, this establishes ripeness – i.e., it is *possible* the indemnity will pass through the corporations to Plaintiffs individually – the workers who filed in the FLSA claim. Factual questions remain about the state of Plaintiffs' corporate entities, and whether Plaintiffs in their individual capacity are actually subject to pecuniary loss as implied by the FAC.

    In sum, Plaintiffs' suit for declaratory relief is jurisdictionally ripe. Plaintiffs have plausibly established the declaration they seek is not necessarily contingent on any finding the court may make in the underlying FLSA suit. Plaintiffs seek a declaration that the public policy of the FLSA is violated

by contractual indemnity provisions attempting to shift liability and/or attorney's fees stemming from an FLSA claim regardless of the outcome of that FLSA litigation. At the pleading stage, the declaration Plaintiffs seek is both viable and the controversy is sufficiently immediate such that it is jurisdictionally ripe.[3] Whether Plaintiffs' theory prevails on the merits will be tested on a more detailed record and with more thorough briefing, and Cenergy is not precluded from raising this issue again at that time.

Finally, because the FAC includes more developed allegations relevant to standing and Plaintiffs' theory of unenforceability of the MSAs indemnity clauses, Plaintiffs shall inform the Court whether there is any need to amend their pending motion for a preliminary injunction. Plaintiffs shall also provide a brief status of the arbitration proceedings.

///

///

///

///

## V.    CONCLUSION

For the reasons set forth above, the Court finds that Plaintiffs have standing to challenge the enforceability of the indemnity provision in the MSAs. Moreover, the claim for declaratory relief is ripe because it is not contingent on the occurrence of any event or finding in the underlying FLSA litigation. It is hereby ORDERED that:

1. Cenergy's motion to dismiss for lack of subject matter jurisdiction is DENIED;

2. Within 2 days, Plaintiffs shall notify the Court whether (1) they wish to amend their motion for a preliminary injunction in light of the First Amended Complaint and the time they need to do so; and (2) provide a brief status update on the pending arbitration

---

[3] Cenergy has not raised any prudential ripeness arguments relating to the Court's discretionary exercise of jurisdiction, and the Court does not find any *Brillhart* factors militate in favor of declining jurisdiction. *Brillhart v. Excess Ins. Co.*, 316 U.S. 491, 495 (1942).

with Cenergy; and

3. If no amended briefing is required on Plaintiffs' motion for a preliminary injunction, the Court will take that matter under submission and issue an order.

IT IS SO ORDERED.

Dated:   **September 20, 2017**             /s/ Lawrence J. O'Neill
                                      UNITED STATES CHIEF DISTRICT JUDGE