Matthew C. Helland, CA SBN 250451
helland@nka.com
Daniel S. Brome, CA SBN 278915
dbrome@nka.com
NICHOLS KASTER, LLP
235 Montgomery St., Suite 810
San Francisco, CA 94104
Telephone: (415) 277-7235
Facsimile: (415) 277-7238

Attorneys for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Donnie Cummings and Charles Beaty, on behalf of themselves and others similarly situated,<br><br>　　　　　　　　　　Plaintiffs,<br><br>　v.<br><br>Cenergy International Services, LLC,<br><br>　　　　　　　　　　Defendant. | **Case No. 1:17-cv-00484-LJO**<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**<br><br>Judge:　　Lawrence J. O'Neill<br>Date:　　　May 14, 2018<br>Time:　　　8:30 a.m.<br>Courtroom:　4<br><br>Complaint Filed: April 5, 2017 |

## I. INTRODUCTION

Earned wages belong to the employee, not the employer; this is a fundamental concept of state and federal employment law. Plaintiffs, who worked on Chevron's oil fields but received payment for their work through Defendant Cenergy International Services, LLC, seek an order that Cenergy may not force Plaintiffs to individually repay back wages they are owed.

This Court has already held that the Fair Labor Standards Act ("FLSA") prohibits contractual indemnification in independent contractor misclassification cases, even if the worker does not establish employee status. *Cummings v. Cenergy Int'l Servs., LLC*, 271 F. Supp. 3d 1182, 1194 (E.D. Cal. 2017). With the benefit of a developed factual record, the Court should now grant judgment in Plaintiffs' favor. Plaintiffs are third party beneficiaries of the contracts between their corporate entities and Cenergy, because Cenergy understood that Plaintiffs intended to perform under those contracts. Plaintiffs have standing to seek declaratory relief because Cenergy continues to threaten them with individual liability. And although the contracts run between Plaintiffs' corporate entities and Cenergy, any funds used to satisfy a judgment against the entities would be funds Plaintiffs earned for their work—the very wages the law protects.

In the time since the Court denied Cenergy's second motion to dismiss, Plaintiff Cummings has prevailed in his arbitration against Chevron and will receive an award of over $284,000 in unpaid wages and liquidated damages, plus attorneys' fees and costs. Cenergy now claims that Cummings Consulting—a dissolved and insolvent company—has breached its contract with Cenergy by failing to tender that $284,000 back to Cenergy. Cenergy's pursuit of Cummings Consulting shows considerable chutzpah, since Mr. Cummings would not have created the company but for Cenergy's threat to withhold payment unless he did so. Plaintiffs respectfully request that the Court shut down Cenergy's indemnification pursuits and issue an order protecting them from individual liability.

## II. FACTUAL SUMMARY

### A. Plaintiffs' Relationship with Cenergy and Chevron

Plaintiffs Cummings and Beaty both worked for Chevron as site managers on Chevron's oil fields. (SUF 1, 25.) The relationships between Plaintiffs and Chevron were controlled by a

-1-

series of intermediary contracts, including contracts between Chevron and Cenergy, contracts between Cenergy and Plaintiffs, and contracts between Cenergy and Plaintiffs' corporate entities. Thus, even though they worked for Chevron, Plaintiffs received their pay by way of Cenergy. (SUF 3, 26.)

Chevron made the ultimate decision of which consultants (like Plaintiffs) to hire, but Cenergy was directly involved in consultant onboarding. (*See* SUF 1, 4-5, 25-27.) Plaintiff Cummings' work stint at Chevron began in May 2013. (SUF 1.) Prior to starting, Mr. Cummings interviewed with Paul Benet, a Chevron superintendent. (SUF 2.) Mr. Benet made the decision to bring Mr. Cummings on board, but Cenergy required that Mr. Cummings sign certain onboarding paperwork before he could start working. (SUF 1, 4-5.) Cenergy required the same from Mr. Beaty. (SUF 31.) Cenergy had specific policies and procedures in place to approve and onboard consultants such as Mr. Cummings and Mr. Beaty, including a specific "authorization to work" that it submitted to its clients (in this case, Chevron). (SUF 5.) Mr. Cummings signed his first contract with Cenergy as an individual. (SUF 6.) That contract set out the rates of pay Mr. Cummings would earn for his work at Chevron. (SUF 7.)

In late 2013, Cenergy instituted a policy requiring all contractors site manager to form their own corporate entities. (SUF 10.) Cenergy's CEO informed consultants (like Mr. Cummings) in no uncertain terms that it would not continue paying them unless they did so. (SUF 10-11 ("The last invoice date for current 1099 payment is 12/20/2013. All invoices received after this date will not be paid until we receive updated w9 form with EIN number and business classification.").) Another Cenergy employee reaffirmed that Cenergy "would be unable to issue payment" to consultants without an updated W9 and updated "banking information" reflecting the consultant's "company information." (SUF 12.) Cenergy provided contractor site managers, including Mr. Cummings, with resources, forms, and detailed instructions regarding which corporate forms Cenergy would accept and which it would not. (SUF 13.) Cenergy sent contractor site managers a highlighted W9 form with written instructions and a list of referrals—including a referral to Legal Zoom for assistance forming a corporate entity. (SUF 14.)

Pursuant to Cenergy's instructions, Mr. Cummings created Cummings Consulting in January 2014. (SUF 15.) He then executed a new Master Services Agreement with Cenergy, this time on behalf of Cummings Consulting. (SUF 16.) Like the individual contract, the corporate contract contained a rate sheet outlining pay rates. (SUF 17.) The rates of pay were the same under both contracts. (SUF 18.) After creating Cummings Consulting, Mr. Cummings continued to submit invoices to Cenergy showing the work he personally performed. (SUF 20.) In fact, he submitted invoices that did not mention Cummings Consulting at all. (*Id.*) Cenergy never provided Mr. Cummings with onboarding paperwork to provide to "employees" of Cummings Consulting.

Mr. Beaty signed a corporate contract with Cenergy in 2014, and received payment from Cenergy through Drilling Consultants, his corporate entity. (SUF 25-27.) That contract included a rate card outlining the rates of pay for Mr. Beaty's work. (SUF 30.) The contract was dated April 28, 2014 and included Mr. Beaty's name, but it identified the corporate entity as "To Be Determined." (SUF 28.) Mr. Beaty signed the contract on May 12, 2014 and included his company's name and address. (SUF 29.) Like Mr. Cummings, Mr. Beaty's invoices for the work he performed at Chevron did not reference his corporate entity. (SUF 33.) Cenergy required that Mr. Beaty sign certain onboarding paperwork, but it never provided any such paperwork for "employees" of Drilling Consultants. (SUF 32.)

**B. Cenergy's Threats and Ongoing Litigation**

As the Court is aware, this case stems from a Fair Labor Standards Act collective action filed against Chevron in the United States District Court for the Northern District of California. Plaintiffs Cummings and Beaty both joined that case as Plaintiffs, and Mr. Cummings' claims were compelled to arbitration early in the litigation. (*See* Helland Decl. Exh. 1.)[1] Plaintiffs filed this declaratory relief action after Cenergy sent them letters (ostensibly through their corporate entities) demanding indemnification related to their claims against Chevron. (First Amend. Compl., ¶ 5, Exh. D.) Although Cenergy filed arbitration claims against Plaintiffs' corporate entities, Cenergy has specifically threatened to seek indemnification from Plaintiffs individually. (SUF 41.) Drillings Consultants and Cummings Consulting have offered to accept an

---

[1] Mr. Beaty's claims against Chevron were compelled to arbitration more recently.

indemnification judgment against them by Cenergy, on the condition that Cenergy not collect indemnification from Mr. Cummings or Mr. Beaty personally. (SUF 42.) Cenergy has not accepted those settlement offers. (SUF 43.) Similarly, on at least two different occasions, Mr. Cummings and Mr. Beaty have offered to dismiss this declaratory relief action on the condition that Cenergy agree not to pursue indemnification from them personally. (SUF 44.) Cenergy has not accepted those settlement offers. (Helland Decl. ¶ 45.)

In the context of Mr. Cummings' arbitration against Cenergy, Chevron sent Counsel for Mr. Cummings a letter "on behalf of both Cenergy and Chevron." (SUF 46.) That letter referred to Mr. Cummings' claims as "absurd" and "frivolous," and specifically threatened individual liability for indemnification:

> Mr. Cummings . . . must face the reality that both he and his company (Cummings Consulting LLC) could be on the hook for substantial fees, costs, and other losses incurred by Cenergy as a result of his litigation. Cummings Consulting LLC contractually agreed to indemnify Cenergy. And based on our investigation, **we believe that Mr. Cummings will be held personally liable for his company's substantial debts to Cenergy under the indemnification agreement**.

(SUF 47.) Presumably hoping to deliver that threat as powerfully as possible, the letter asserted that Mr. Cummings' counsel "may not communicate [the contents of the letter] to [Mr. Cummings] orally." (SUF 48.) Chevron sent a similar letter regarding Mr. Beaty, specifically threatening that "**Mr. Beaty will be held personally liable for his company's substantial debts to Cenergy under the indemnification agreement**." (SUF 49.)

Chevron and Cenergy were wrong; Mr. Cummings' claims were not "frivolous" or "absurd." After a three day evidentiary hearing in December 2017, the Arbitrator found that Mr. Cummings was an employee of Chevron, not an independent contractor, and that he was entitled to unpaid overtime, liquidated damages, meal period premiums, rest period premiums, and attorneys' fees and costs. (SUF 38.) Pursuant to the Interim Arbitration Award, the parties agreed to damages of $284,270.15. (SUF 39.) Mr. Cummings has filed his motion for attorneys' fees and costs, which will be heard May 17, 2018. (SUF 40.)

After issuance of the interim arbitration award, Cenergy reinstituted its previously-dismissed indemnification actions against Cummings Consulting and Drilling Consultants. (SUF

-4-

51.) In its indemnification action against Cummings Consulting, Cenergy seeks over $500,000 in damages, in the form of the wages Mr. Cummings will recover from Chevron and Chevron's attorneys' fees and costs. (SUF 52.) Cenergy claims Cummings Consulting has breached its contract with Cenergy for failure to tender the $284,000 damages award back to Cenergy. (SUF 53.) Cenergy likewise seeks a declaration that Drillings Consultants must "defend, indemnify, and hold Cenergy harmless for all attorneys' fees and other damages related to Beaty's overtime claims." (SUF 55.)

Cenergy filed both of these demands will full knowledge that Cummings Consulting and Drilling Consultants are dissolved. (SUF 54, 56.) Mr. Cummings first attempted to dissolve Cummings Consulting starting in 2016, and then successfully dissolved the company in March 2017. (SUF 22.) The only revenue Cummings Consulting ever received was for work Mr. Cummings performed for Chevron. (SUF 21.) Mr. Cummings closed the Cummings Consulting checking account in December 2015, and the balance in the Cummings Consulting savings account has been $5.76 since that date. (SUF 23-24.) Similarly, Mr. Beaty dissolved his corporate entity in 2017, after changing the name from Drilling Consultants, Inc. to Total Depth Drilling and Safety Consultants. (SUF 34, 36.) Mr. Beaty closed his corporate banking account in October 2016 after bringing the balance from $52.32 to zero. (SUF 37.)

**III.   ARGUMENT**

Summary judgment is appropriate when the evidence shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Summary judgment should be granted unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). Evidence that is "merely colorable, or is not significantly probative," is insufficient to avoid summary judgment. *Id.* at 250. Here the Court should enter judgment on Plaintiffs' request for declaratory relief because there is no dispute that (1) Plaintiffs are third party beneficiaries of the contracts at issue, (2) Cenergy has threatened them with individual liability, and (3) indemnification by Plaintiffs' dissolved corporate entities would implicate Plaintiffs' own earnings.

**A.  Cummings and Beaty Were Intended Third Party Beneficiaries**

In granting summary judgment to Plaintiffs, the Court should confirm that Plaintiffs Cummings and Beaty were intended third party beneficiaries of the contracts between their corporate entities and Cenergy. As this Court has recognized, third party beneficiary status is "gathered from reading the contract as a whole **under the light of the circumstances under which it was entered**." *Walters v. Marler*, 83 Cal. App. 3d 1, 32 (Ct. App. 1978) (emphasis added); *Cummings*, 271 F. Supp. 3d at 1188. "In determining the meaning of a written contract allegedly made, in part, for the benefit of a third party, evidence of the circumstances and negotiations of the parties in making the contract is both relevant and admissible." *H.N. & Frances C. Berger Found. v. Perez*, 218 Cal. App. 4th 37, 45 (2013). "It is not necessary that the intent to benefit the third party be manifested by the promisor; it is sufficient that the promisor *understand* that the promisee has such intent." *Alling v. Universal Mfg. Corp.*, 5 Cal. App. 4th 1412, 1440 (1992) (emphasis in original). "Neither is it necessary that the contract identify or refer to the third party beneficiary by name; the beneficiary may recover if he or she can show that it was intended that he or she be benefited by the contract." *Id.*

Here the undisputed facts show Cenergy understood that Cummings and Beaty would perform (and actually did perform) the work described in the Master Services Agreements at issue. For example, Cenergy required that Cummings and Beaty sign onboarding paperwork prior to working for Chevron. (SUF 1, 4-5, 31.) This onboarding paperwork pertained to Plaintiffs individually, not to their corporate entities. Cenergy had specific policies and procedures in place to approve and onboard consultants such as Mr. Cummings and Mr. Beaty, including specific "authorization to work" that it submitted to its clients (in this case, Chevron). (SUF 5.) Cenergy never asked Plaintiffs to procure signatures on similar documents for "employees" of their companies, nor did Cenergy provide any copies of onboarding paperwork for "employees" of Plaintiffs' corporate entities. (SUF 19, 32.) As this Court has recognized, "[i]t is not necessary that the intent to benefit the third party be manifested by the promisor; it is sufficient that the promisor *understand* that the promisee has such intent." *Alling*, 5 Cal. App. 4th 1440. Before

someone other than Cummings or Beaty could have fulfilled the contracts, Cenergy would have required that those individuals submit to its onboarding process. That never happened.

Moreover, Plaintiff Cummings had been working for Chevron through Cenergy for over six months when Cenergy instituted its new policy regarding corporate formation. (*See* SUF 1, 10.) Cenergy communicated directly with Mr. Cummings about setting up his corporate entity—*which Cenergy required for Mr. Cummings to receive payment for the work he performed*. The record is clear that Mr. Cummings would continue doing the same sort of work after Cenergy's policy change, with the only difference being an additional layer of contracts in the relationship. And with respect to Mr. Beaty, the original draft of his corporate contract did not even include a corporate name—clear evidence that Cenergy was more interested in Mr. Beaty than his company. The record leaves no doubt. Cenergy understood that Plaintiffs Beaty and Cummings intended to perform the work contemplated in these contracts. They are third party beneficiaries.

### B. Cummings and Beaty Live Under Continued Threat of Suit

"[T]he threat of suit is enough to create standing" in a declaratory relief action. *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1056 (9th Cir. 2008); *see also Societe de Conditionnement en Aluminium v. Hunter Eng'g Co.*, 655 F.2d 938, 944 (9th Cir. 1981). Accordingly, a statement that puts the recipient in "defense posture" with respect to continued activity is sufficient to provide standing to seek declaratory relief. *Societe de Conditionnement en Aluminium*, 655 F.2d at 944. Attempts to withdraw a threat after the initiation of a declaratory relief action do not destroy standing, as the dismissal under such circumstances "would leave [the plaintiff] with the 'Draconian threat' of litigation hanging over its head. *Id.* at 945.

In denying Cenergy's second motion to dismiss this action, the Court recognized that "Cenergy is unwilling to relinquish any right it may have to pursue its indemnity claim, and has expressly maintained it will bring suit when it deems necessary. These facts together constitute a threat of suit against Plaintiffs in their individual capacity giving rise to standing." *Cummings*, 271 F. Supp. 3d at 1191. In making that finding, the Court relied on exhibits to Plaintiffs' First Amended Complaint. To that factual record, Plaintiffs now add their settlement offers (which

Cenergy has declined), s*ee* SUF 42-45, as well as explicit threats by Chevron and Cenergy against Plaintiffs. (SUF 47, 49.)

Prior to Plaintiff Cummings emerging victorious in his arbitration, Chevron's Counsel wrote Mr. Cummings "on behalf of both Cenergy and Chevron." That letter explicitly threatened Mr. Cummings with personal liability for indemnification:

> Finally, if Mr. Cummings proceeds with his frivolous lawsuit, he must face the reality that both he and his company (Cummings Consulting LLC) could be on the hook for substantial fees, costs, and other losses incurred by Cenergy as a result of his litigation. Cummings Consulting LLC contractually agreed to indemnify Cenergy. And based on our investigation, **we believe that Mr. Cummings will be held personally liable for his company's substantial debts to Cenergy under the indemnification agreement**.

(SUF 47.) Chevron sent a similar letter to Mr. Beaty "on behalf of both Cenergy and Chevron," with the same threat of individual litigation: "**we believe that Mr. Beaty will be held personally liable for his company's substantial debts to Cenergy under the indemnification agreement**." (SUF 49.)[2] After Mr. Cummings' successful arbitration, he again offered to dismiss this declaratory relief action in exchange for Cenergy's agreement not to pursue individual indemnification from Mr. Cummings. (*See* SUF 44-45.) Cenergy did not accept that offer.

In short, Cenergy (on its own and in conjunction with Chevron) has explicitly threatened Plaintiffs with individual indemnification on several occasions, and has rejected repeated settlement offers to dismiss this action in exchange for a release of its alleged indemnification rights against Plaintiffs. Cenergy continues to pursue indemnification actions against Drilling Consultants and Cummings Consulting despite full knowledge that the entities are dissolved and insolvent, and despite offers by those entities to accept judgment against them. Assuming Cenergy is a rational actor, the only legitimate purpose of Cenergy's litigation is to eventually seek indemnification from Plaintiffs individually—which Cenergy has threatened to do. The Court should enter a declaration *now* that the law prohibits Cenergy from holding Plaintiffs personally liable for indemnification, in order to relieve Plaintiffs of the substantial cost and burden

---

[2] The letters sought to ensure delivery of indemnification threat by instructing counsel it "may not communicate [contents of the letter] to [Plaintiffs] orally." (SUF 47, 49.)

associated with defending arbitrations brought against their dissolved corporate entities, and to prevent Chevron and Cenergy from using threats of personal indemnification to induce below-value settlements and the waiver of important statutory rights.

**C. The Indemnity Provisions are Void under State and Federal Law as Contrary to Public Policy**

"Under California law, 'a contractual provision that contravenes public policy, as expressed in statute or implied from its language, is 'either void or unenforceable.''" *Cummings*, 271 F. Supp. 3d at 1192 (quoting *Santillan v. USA Waste of Cal., Inc.*, 853 F.3d 1035, 1045–46 (9th Cir. 2017)). United States Supreme Court has repeatedly "held that FLSA rights cannot be abridged by contract or otherwise waived because this would 'nullify the purposes' of the statute and thwart the legislative policies it was designed to effectuate." *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 740 (1981). At least four circuits have recognized that employers may not seek indemnification from workers for the obligation to pay wages required by the FLSA. *See Herman v. RSR Sec. Services Ltd.*, 172 F.3d 132, 144 (2d Cir. 1999) (no right of indemnification under the FLSA, and "the FLSA's remedial scheme is sufficiently comprehensive as to preempt state law" that might create indemnification claim); *Martin v. Gingerbread House, Inc.*, 977 F.2d 1405, 1407–08 (10th Cir. 1992) ("Indemnity actions against employees work against the purposes of the FLSA. . . . Compliance with the FLSA will not be furthered if employees must defend against indemnity actions."); *Lyle v. Food Lion, Inc.*, 954 F.2d 984, 987 (4th Cir. 1992) ("In effect, [the employer] sought to indemnify itself . . . for its own violation of FLSA, which . . . is something the FLSA simply will not allow."); *LeCompte v. Chrysler Credit Corp.*, 780 F.2d 1260, 1264 (5th Cir. 1986) ("[A]n employer who believed that any violation of the . . . provisions could be recovered from its employees would have a diminished incentive to comply with the statute.").

In Cenergy's second motion to dismiss, it argued that the Court could not determine whether its indemnification provisions violated public policy until there was an adjudication of Plaintiffs' employee status under the FLSA. *See* ECF No. 17 at 13-15 of 16; ECF No. 20 at 9-15 of 15. The Court rejected those arguments. As a result, the law of the case is that "FLSA public

-9-

policy forecloses indemnity provisions that shift attorney's fees for FLSA suits onto the workers who file those suits, regardless of the outcome of the case on the merits." *Cummings*, 271 F. Supp. 3d at 1194 (noting two "well reasoned" decisions reaching that result and "follow[ing] them here").[3] That is because "the public policies underpinning the FLSA are implicated when FLSA claims are *filed*—not only when the plaintiff prevails." *Id.* Of course, this distinction no longer matters for Mr. Cummings. Since he was adjudicated to be an employee of Chevron, indemnification for his underlying wages or fees and costs violates black letter FLSA law. *Barrentine*, 450 U.S. at 740; *Herman*, 172 F.3d at 144; *Martin*, 977 F.2d at 1407–08; *Lyle,* 954 F.2d at 987; *LeCompte*, 780 F.2d at 1264.

Plaintiff Cummings (but not Beaty) sued Chevron under California state law, in addition to the FLSA. Now that he has been adjudicated an employee of Chevron, any attempt to seek indemnity from him personally would also be void under California law. *See* Cal. Lab. § 2802. "Labor Code section 2802, subdivision (a), provides for an employee's right to indemnity." *Edwards v. Arthur Andersen LLP*, 44 Cal. 4th 937, 951 (2008). "Labor Code section 2804 voids any agreement to waive the protections of Labor Code section 2802 as against public policy. . . . Thus, indemnity rights are nonwaivable, and any contract that does purport to waive an employee's indemnity right would be contrary to the law and therefore unlawful to that extent." *Id.* 951–52. Indemnification rights under Section 2802 include defense attorneys' fees and costs. *Cassady v. Morgan, Lewis & Bockius LLP*, 145 Cal. App. 4th 220, 230 (2006), *as modified* (Dec. 21, 2006). Since Cummings has a statutory right to indemnification from Chevron as its employee, any attempt to put that indemnification obligation back on Mr. Cummings, whether through contract or common law, is void as a matter of California public policy and statute.[4]

---

[3] Plaintiffs briefed this issue extensively in opposition to Cenergy's second motion to dismiss. *See* ECF No. 19. Given the Court's order on that motion, Plaintiffs will not re-brief it here, but incorporate their previous briefing to the extent necessary.

[4] Moreover, the California Labor Code, like the FLSA, provides one-way fee shifting. *See Kirby v. Immoos Fire Prot., Inc.*, 53 Cal. 4th 1244, 1251 (2012) (recognizing that Labor Code section 1194, applicable to overtime claims, is a one-way fee shifting statute, and rejecting application of a two-way fee shifting statute to meal period claims). This Court noted the FLSA's one-way fee shifting provision in holding that "public policy forecloses indemnity provisions that shift attorney's fees for FLSA suits onto the workers who file those suits . . . ." *Cummings*, 271 F.

      ***i.    Plaintiffs are entitled to judgment because Cenergy has directly threatened to pierce the corporate veil***

After the Court's order denying Cenergy's motion to dismiss, the only unresolved factual question is the extent to which Cenergy's indemnification attempts might touch Plaintiffs personally. Recent correspondence exposes Chevron and Cenergy's views on the matter: "**we believe that Mr. Cummings [and Mr. Beaty] will be held personally liable for [their] compan[ies'] substantial debts to Cenergy under the indemnification agreement[s]**." (SUF 47, 49.) Chevron's and Cenergy's direct threats to pierce the corporate veil are certainly one way in which Plaintiffs could face individual exposure. *See Cummings*, 271 F. Supp. 3d at 1195.

Indeed, Cenergy continues to pursue corporate indemnification, despite knowledge that judgments against Cummings Consulting and Drilling Consultants would be uncollectable from those entities. On these facts, there is no question that Cenergy will attempt to collect from Plaintiffs individually, absent settlement or an order from this Court. Any such attempt would violate the state and federal public policy, and the Court should enter a declaratory judgment to that effect *now*. The purpose of a declaratory relief action is to "afford relief from the uncertainty faced by the parties." *Newcal*, 513 F.3d at 1057. In *Newcal*, the Ninth Circuit held that "even a broad declaration that IKON's fraudulent conduct has rendered invalid all of its fraudulently procured contracts would be a declaration that is grounded in the particular facts of the controversy before the court." *Id.* Similarly here, Plaintiffs are entitled to a broad declaration that any attempt to pierce the corporate veil or collect indemnification from Plaintiffs would violate public policy, rendering the contractual underpinnings of such efforts void as a matter of law. Stated another way, the Court should enter judgment that Cenergy may not use these contracts at issue to collect individual indemnification from Plaintiffs under any circumstances.

Plaintiffs need not wait until Cenergy obtains a judgment against their corporate entities and then brings an action to pierce the corporate veil before obtaining declaratory relief from this Court, and Plaintiffs need not prove as a matter of law that Cenergy would be successful in

---

Supp. 3d at 1194. By the same reasoning, any attempt to shift defense fees or costs onto Plaintiff Cummings violates California public policy.

-11-

piercing the corporate veil to be eligible for a declaratory judgment. It is enough for Plaintiffs to show that Cenergy has directly threatened such action, and that such action would violate public policy. In *Newcal*, the "uncertainty faced by the parties" rested in one party's "legal right to recover . . . for tortious interference." *Newcal*, 513 F.3d at 1057. The Ninth Circuit held that declaratory relief would be appropriate under those circumstances, to "clarify or settle the legal relations in issue." *Id.* Here, the Court should clarify the legal relations in issue by entering a declaratory judgment that Cenergy may not collect indemnification from Plaintiffs under any legal theory. Such an order would preclude wasteful and expensive litigation regarding corporate indemnification, and would prevent Cenergy and Chevron from using the threat of individual indemnification to devalue Plaintiffs' claims.

> ## ii.   *Plaintiffs are entitled to declaratory judgment because corporate indemnification would necessarily implicate their own earnings*

While Cenergy's intention to pierce the corporate veil is clear from the record, the Court need not rely on a veil-piercing theory to enter judgment in Plaintiffs favor. It is certainly true, as the Court recognized in denying Cenergy's motion to dismiss, that the contractual indemnification at issue stems from Cenergy's relationship with Plaintiffs' corporate entities. *See Cummings*, 271 F. Supp. 3d at 1194. But contractual indemnification against a corporate entity violates public policy **if it results in the workers themselves bearing the cost of the indemnification**. *See id.* at 1194-95. The *Pepsi Allied* case addressed a similar situation involving contractual indemnification in a collective bargaining agreement. *See Local 1035, Int'l Bhd. of Teamsters v. Pepsi Allied Bottlers, Inc.*, 99 F. Supp. 2d 219 (D. Conn. 2000). There the contract held the union (not the workers) responsible for indemnification, but the court observed that "the union would utilize funds collected as dues from the plaintiffs themselves in order to satisfy the judgments, thereby making the individual employees, whom the statue was designed to protect, pay for the wrongful acts of another." *Id.* at 221. The court invalidated the contractual indemnification under those circumstances, refusing "to create such a potential exception to the general rule against using indemnification clauses to potentially immunize a defendant from liability for its own wrongful acts." *Id.*

Here, the record leaves no doubt that Donnie Cummings only created Cummings Consulting because Cenergy required it as a condition of payment. (SUF 10-15.) As part of that structural change in the relationship, Cenergy made Mr. Cummings sign a contract purporting to indemnify Cenergy for any losses resulting from the relationship. The only "revenue" Cummings Consulting ever received was Mr. Cummings' own wages. (SUF 21; *see also* SUF 35 (regarding Mr. Beaty).) After Mr. Cummings prevailed at arbitration, Cenergy sued his dissolved and insolvent corporate entity to recoup the wages to which Mr. Cummings is legally entitled.

This case exposes the dark underbelly of independent contractor abuses and implicates the very evils identified in *Pepsi Allied*. Chevron, Mr. Cummings' actual employer, purports to shield itself from its employment obligations with layers upon layers of contractual relationships. Cenergy participates in the ruse by feeding workers to Chevron, taking a cut of the workers' pay, and then forcing the workers to start their own companies so that it might shield itself from any legal exposure. Allowing indemnification in these circumstances would "create such a potential exception to the general rule against using indemnification clauses to potentially immunize a defendant from liability for its own wrongful acts." *Pepsi Allied*, 99 F. Supp. 2d at 221. The Court can and should invalidate the corporate indemnification provisions here—regardless of the likelihood of collecting from the entities—because those entities would be forced to use wages earned by "plaintiffs themselves in order to satisfy the judgments, thereby making the individual employees, whom the statue was designed to protect, pay for the wrongful acts of another." *Id.*

Cenergy's recent arbitration demand against Cummings Consulting leaves no doubt as to Cenergy's end game. Mr. Cummings is entitled to an award of over $284,000 in unpaid wages and liquidated damages, plus his attorneys' fees and costs. Cenergy claims that Cummings Consulting—a dissolved and insolvent company *Cenergy forced Mr. Cummings to create as a condition of payment*—has breached its contractual obligations by failing to tender that $284,000 back to Cenergy, and by failing to pay for Cenergy's defense of Mr. Cummings' arbitration. The suggestion that Mr. Cummings must pay Gibson Dunn for its unsuccessful efforts to defeat his claims is absurd. It is also contrary to the one-way fee shifting under the FLSA and the Labor Code, the black letter proposition that employers may not contract out of the FLSA, the law of

-13-

this case, and the Labor Code's requirement that employers indemnify employees, not the other way around. 29 U.S.C. § 216(b); *Barrentine*, 450 U.S. at 740; *Cummings*, 271 F. Supp. 3d at 1194; Cal. Lab. § 2802.

Likewise, Cenergy seeks a declaration that Drilling Consultants must "defend, indemnify, and hold Cenergy harmless for all attorneys' fees and other damages related to Beaty's overtime claims." (SUF 55.) In other words, Cenergy seeks a declaration that Mr. Beaty's dissolved and insolvent corporate entity is responsible for defending against Mr. Beaty's overtime claims, and must pay any damages Mr. Beaty might obtain. Even if Drilling Consultants still existed and had the funds to satisfy a judgment, those funds would have come from Mr. Beaty's own work. Stripping back the formalities, Cenergy seeks to hold Mr. Beaty responsible for defending his own lawsuit and paying any wages he might be owed. The law does not allow this result.

Nothing shows the power of these contractual indemnification provisions better than the Chevron / Cenergy letter to Mr. Cummings. On the eve of his arbitration, Chevron and Cenergy offered to settle his claims for less than $40,000—a settlement that would have also dismissed PAGA claims that are still pending in the Northern District of California. According to the letter, the offer was "far greater than [Mr. Cummings] could ever expect to receive at arbitration." (SUF 47.) Mr. Cummings did not succumb to the threat of individual liability, and he prevailed to the tune of over $284,000 plus fees and costs. Nevertheless, the letter shows that the true value in Chevron and Cenergy's indemnification scheme is the avoidance of lawsuits, not the reimbursement for judgments.

This Court has already recognized the chilling effect of contractual indemnification provisions:

> If courts imposed an attorneys' fees award against unsuccessful independent contractors that have indemnity agreements, it would incentivize employers to mis-classify employees as independent contractors in an independent contractor agreement that contains an indemnity provision based on the hope that the possibility of an attorneys' fee award would dissuade litigation on the issue.

*Cummings*, 271 F. Supp. 3d at 1194 (quoting *Abdul–Rasheed v. KableLink Commc'ns, LLC*, 2013 WL 6182321, at *6 (M.D. Fla. Nov. 25, 2013). Chevron and Cenergy's threats of individual indemnification are a clear attempt to dissuade litigation. The Court should enter judgment that

-14-

Cenergy cannot collect indemnification from Plaintiffs individually, so that Mr. Cummings may reduce his arbitration to a judgment and collect on it without fear that it will be clawed back, and so Mr. Beaty may proceed with his FLSA claims free from the threat of indemnification.

### IV.     CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court put an end to Cenergy's vexatious indemnification litigation by declaring that Cenergy may not recover indemnification from Plaintiffs under any theory of recovery or liability.

Dated:   April 13, 2018                    **NICHOLS KASTER, LLP**

By:     s/Matthew C. Helland
        Matthew C. Helland
Attorneys for Plaintiffs and Others Similarly Situated